PJS:BB:nl

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA )   CRIMINAL NO. 12-181
)
v. )
)   ( Rambo, J.)
ROBERT G. BARD, )
)
Defendant. )

INDICTMENT

COUNT ONE

(SECURITIES FRAUD)

FILED
HARRISBURG

JUL 1 8 2012

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

THE GRAND JURY CHARGES:

I.   THE DEFENDANT

1.   The defendant, Robert G. Bard ("Bard"), was President,
managing member, and sole owner of Vision Specialist Group,
L.L.C. ("Vision Specialist"), an investment advisor registered in
Pennsylvania and West Virginia.  Bard completely controlled the
operations of Vision Specialist, including making investment
decisions for Vision Specialist clients.


II.   VISION SPECIALIST

2.   Vision Specialist was a company created in December
2004, that was located in Warfordsburg, Pennsylvania, within the

Middle District of Pennsylvania.  Warfordsburg is a small rural community in Fulton County, and the large majority of Vision Specialist clients lived in and around Warfordsburg and the border regions of Maryland and West Virginia.  On May 21, 2009, Bard reported to Pennsylvania regulatory authorities that Vision Specialist had approximately $9 million in client assets under its management with 140 accounts involving between 101 and 250 clients.

3.  Vision Specialist marketed itself on the internet and in brochures as a "wealth manager."  Bard provided Vision Specialist clients with fee-based investment advisory services, financial planning, and tax preparation services.  Vision Specialist clients maintained their own investment accounts with a broker-dealer selected by Bard.  Until March 2009, T.D. Ameritrade, Inc., acted as the broker-dealer for Vision Specialist clients. T.D. Ameritrade is located in Omaha, Nebraska, and Bard accessed client accounts using the internet using his computer, laptop, or other computer.  T.D. Ameritrade's computer servers are located in Carrolton, Texas, and Jersey City, New Jersey.

4.  According to the standard investment advisory agreement signed by the clients, Bard maintained discretionary authority to supervise and direct the investment of assets in the clients'

accounts without the need to consult with the client on a transaction-by-transaction basis.  Bard, however, agreed to exercise his authority in accordance with the objectives set forth in the clients' profile.  Nothing in the advisory agreement allowed Bard or Vision Specialist to omit material information regarding the nature or value of the investments in the clients' accounts or make any misrepresentations to clients.  Furthermore, Bard advertised that Vision Specialist employed "sophisticated risk management" and protected its clients from over extending their risk of loss.  Many of Vision Specialist clients were elderly, unsophisticated investors with little investment experience, who desired low-risk investments such as money-market funds, interest bearing accounts, or certificates of deposit. Furthermore, Vision Specialist clients were encouraged to destroy their monthly account statements as soon as the new statement arrived because Bard promised to maintain their paperwork in his office.

### III.   THE SCHEME TO DEFRAUD

5.  Bard executed and attempted to execute, a scheme and artifice to defraud numerous clients of Vision Specialist by soliciting and obtaining millions of dollars under false

-3-

pretenses, by failing to invest the fraudulently obtained funds as promised, and by repeatedly concealing and covering up the fact that he had squandered their investments on risky stocks and other volatile investments.

6.   To execute the scheme, Bard represented himself as a deeply religious man of the highest integrity.  Vision Specialist clients were never informed, however, that in September 2004, immediately prior to opening up Vision Specialist, Bard was terminated as a stock broker after the brokerage firm he worked for discovered that he had prepared and submitted investment documents that contained forged customer signatures and other irregularities.  Nor did Bard inform Vision Specialist clients that the Financial Industry Regulatory Authority ("FINRA"), determined that Bard forged customer signatures and improperly guaranteed investment returns, and that Bard signed an acceptance, waiver, and consent on October 6, 2005, barring his future association with any FINRA member.  Nor did Bard inform Vision Specialist clients that he filed a petition for bankruptcy on July 22, 2005 and that he was in bankruptcy court until August 11, 2011, when his personal debts were discharged by order of the bankruptcy court.  Rather, Vision Specialist clients were told

-4-

that Bard had eighteen years of financial success and that they could trust him with their life savings.

7.  On numerous occasions, with numerous clients, Bard explicitly agreed to invest his clients' funds in conservative, low-risk investments such as money-market funds, interest bearing accounts, or certificates of deposit.  Bard, however, disregarded these clients' wishes and invested their money in high-risk securities such as penny stocks, oil and gas securities, and foreign index funds that suffered enormous declines in value.

8.  For example, beginning in September 2006, Bard invested a large number of his clients and millions of dollars of their funds, in L International Computers, Inc. ("L Computer"), a penny stock pink sheet issuer, that was clearly inappropriate for many of Bard's clients who desired low-risk investments.  Bard continued to invest his clients' funds in L Computer even after he complained to regulatory authorities that L Computer was a "bogus" company without any product.  Between September 2006 and May 2009, Bard's clients lost over $3 million in L Computer as its value dropped to zero.

9.  Similarly, Bard invested a large number of his clients and hundreds of thousands of dollars of their funds, in other high-risk securities such as Dune Energy, Inc. ("Dune Energy"), a

development stage, independent oil and exploration company, and
Advantage Energy Income Fund ("Advantage Energy"), a Canadian oil
and gas royalty trust, and emerging market exchange traded funds
("ETF's") such as iShares MSCI Malaysia--an ETF focused on the
Malaysian stock market.  Bard's clients lost several hundred
thousand dollars investing in Dune Energy and Advantage Energy
alone.

        10.  In an effort to conceal the enormous declines in the
clients' accounts, to hide investment choices that went against
the explicit desires of the clients, and to generate more fees
for himself, Bard repeatedly provided clients with false verbal
assurances and phony account statements which grossly overstated
the values in their accounts.  Between July 2006 and August 2009,
Bard repeatedly lied to approximately 43 Vision Specialist
clients about the value and make-up of their investment accounts.

        11.  Bard's misrepresentations to his clients took various
forms, including, but not limited to:  (1) creating and providing
clients with what he claimed were simplified statements of
account that were in reality, false and inflated; (2) informing
clients that their investments were "backed and secured by the
full faith of the U.S. government" and guaranteed to earn money;
(3) using computer on-line services via the internet, such as

Morningstar.com and Smartmoney.com, whose servers were located outside of Pennsylvania, to create false and inflated account information that was provided to clients; and (4) altering actual brokerage statements from T.D. Ameritrade to inflate values and holdings in the clients' accounts.  One such piece of false information added to many clients' accounts concerned alleged holdings in a very conservative, low-risk fund trading under the ticker symbol, "TCUUX," which could only be purchased by credit unions and could not even be purchased by individuals.  In fact, Bard never purchased TCUUX for any of his clients and he simply fabricated the entry, as well as other information on the account statements to make it appear that the account values had not diminished.

12.  After Bard had misrepresented the make-up and values in his clients' accounts, clients suffered more than $2 million in additional losses.  During the same time period, Bard generated over $852,000 in fees from all client accounts.

## IV.  STATUTORY ALLEGATION

13.  From on or about December 2004 until on or about August 2009, in the Middle District of Pennsylvania and elsewhere,

**ROBERT G. BARD**

-7-

knowingly and willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons and entities.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5.

## COUNTS TWO THROUGH FIFTEEN
### (WIRE FRAUD)

THE GRAND JURY FURTHER CHARGES:

14.   The allegations contained in paragraphs 1 through 12 of this Indictment are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

15.   On or about the dates set forth below, in the Middle District of Pennsylvania and elsewhere,

### ROBERT G. BARD

knowingly and willfully devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises and for the purpose of executing the scheme and artifice to defraud and to obtain money and property, and attempting to do so, did on or about the dates specified below, transmit by means of wire, radio, and television communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, as more particularly described in each count below:

| Count | Date | Nature of Wire Transmission |
|---|---|---|
| 2 | 12/08/08 | Internet access to Morningstar.com to create fake account document showing $399,491 holdings in TCUUX for investors M.S. and N.S. |
| 3 | 01/09/08 | Internet access to Morningstar.com to create fake account document showing $360,458 holdings in TCUUX for investors C.M. and B.M. |

| Count | Date | Nature of Wire Transmission |
|---|---|---|
| 4 | 03/03/08 | Internet access to Morningstar.com to create fake account document showing $138,227 holdings in TCUUX for investor W.B. |
| 5 | 03/25/08 | Internet access to Morningstar.com to create fake account document showing $266,752 holdings in TCUUX for investor J.B. |
| 6 | 05/23/08 | Internet access to Morningstar.com to create fake account document showing $186,612 holdings in TCUUX for investor R.U. |
| 7 | 04/03/08 | Internet access to Morningstar.com to create fake account document showing $122,312 holdings in TCUUX for investors C.F. and K.F. |
| 8 | 03/05/09 | Internet access to T.D. Ameritrade.com to create fake account document showing $79,109.24 holdings in TCUUX for investor R.G. |
| 9 | 07/30/08 | Internet access to Morningstar.com to create fake account document showing $42,610 holdings in TCUUX for investor A.D. |
| 10 | 01/25/09 | Internet access to T.D. Ameritrade.com to create fake account document showing $20,118 holdings in TCUUX for investor W.S. #1 |
| 11 | 10/23/08 | Internet access to T.D. Ameritrade.com to create fake account document showing $2,310 holdings in TCUUX for investor W.S. #2 |

| Count | Date | Nature of Wire Transmission |
|-------|------|-----------------------------|
| 12 | 09/03/08 | Internet access to T.D. Ameritrade.com to create fake account document showing $2,019 holdings in TCUUX for investor T.C. |
| 13 | 06/04/09 | Internet access to Smartmoney.com to create fake account document showing $192,000 holdings in TCUUX for investors S.R. and B.R. |
| 14 | 06/10/09 | Internet access to T.D. Ameritrade.com to create fake account document showing $78,522 holdings in TCUUX for investor J.G. |
| 15 | 04/17/09 | Email from drbard@frontiernet.net to investors A.S. and N.S. @bellsouth.net regarding transfer of accounts from T.D. Ameritrade. |

Each count in violation of Title 18, United States Code, Section 1343.


## COUNTS SIXTEEN THROUGH EIGHTEEN

### (MAIL FRAUD)

THE GRAND JURY FURTHER CHARGES:

16. The allegations contained in paragraphs 1 through 12 of this Indictment are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

17.   On or about the dates set forth below, in the Middle
District of Pennsylvania and elsewhere,

### ROBERT G. BARD

knowingly and willfully devised and intended to devise a scheme
and artifice to defraud, and to obtain money and property by
means of materially false and fraudulent pretenses,
representations, and promises and for the purpose of executing
the scheme and artifice to defraud and to obtain money and
property and attempting to do so, did on or about the dates
specified below cause to be placed in post offices and authorized
depositories for mail matter the particular item(s) described in
each count below, to be sent and delivered by the United States
Postal Service and to be delivered by mail according to the
directions thereon, and at the places at which they were directed
to be delivered, by the person to whom it was addressed, as more
fully set forth below:

| Count | Date | From | To | Item Mailed |
|-------|------|------|-----|-------------|
| 16 | 12/17/08 | Vision Specialist Group, Robert Bard, MBA, Ph.D. M.A., 404 West Hess Road, Warfordsburg, PA 17267 | Mr. & Mrs. T.C., XXX Buchanon Trail, McConnellsburg, PA 17233 | T.D. Ameritrade account document showing $17,249 in TCUUX for investor T.C. |

| | Count | Date | From | To |
|---|---|---|---|---|
| 17 | | 03/05/09 | Vision Specialist Group, Robert Bard, MBA, Ph.D. M.A., 404 West Hess Road, Warfordsburg, PA 17267 | Mr. & Mrs. T.C., XXX Buchanon Trail, McConnellsburg, PA 17233 | T.D. Ameritrade account document showing $22,095.57 in TCUUX for investor T.C. |
| 18 | | 01/25/09 | Vision Specialist Group, Robert Bard, MBA, Ph.D. M.A., 404 West Hess Road, Warfordsburg, PA 17267 | Mr. W.S., XXX Lower Clover Creek Rd., Williamsburg, PA 16693 | T.D. Ameritrade account document showing $20,118.00 in TCUUX for investor W.S. #1 |

Each count in violation of Title 18, United States Code, Section 1341.

## COUNT NINETEEN

### (BANK FRAUD)

**THE GRAND JURY FURTHER CHARGES:**

18. The allegations contained in paragraphs 1 through 12 of this Indictment are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

19. On or about December 22, 2008, in the Middle District of Pennsylvania and elsewhere,

-13-

ROBERT G. BARD

knowingly and willfully executed and attempted to execute, a

scheme and artifice to defraud a financial institution that was

insured by the Federal Deposit Insurance Corporation, to wit:  F

& M Trust, in that the defendant faxed a fraudulent T.D.

Ameritrade account statement in the name of investor W.B. to F &

M Trust that significantly inflated W.B.'s account value,

including $316,481 in a "cash-CD" that did not exist, in

connection with a loan application made by investor W.B. to F & M

Trust.

In violation of Title 18, United States Code, Section 1344.


COUNT TWENTY

(INVESTMENT ADVISOR FRAUD)

THE GRAND JURY FURTHER CHARGES:

20.  The allegations contained in paragraphs 1 through 12 of

this Indictment are hereby repeated, realleged, and incorporated

by reference as if fully set forth herein.

21.  From on or about December 2004 until on or about August

2009, in the Middle District of Pennsylvania and elsewhere,

ROBERT G. BARD,

-14-

acting as an investment advisor with respect to clients and

potential clients of VSG, knowingly and willfully, by the use of

the mails and means and instrumentalities of interstate commerce,

directly and indirectly, did:  (a) employ devices, schemes, and

artifices to defraud clients and prospective clients; (b) engage

in transactions, practices, and courses of business which

operated as a fraud and deceit upon clients and prospective

clients; and (c) engage in acts, practices, and courses of

business that were fraudulent, deceptive, and manipulative.

In violation of Title 15, United States Code, Sections 80b-6
and 80b-17.

### COUNT TWENTY-ONE

### (FALSE STATEMENTS)

**THE GRAND JURY FURTHER CHARGES:**

22.  The allegations contained in paragraphs 1 through 12 of

this Indictment are hereby repeated, realleged, and incorporated

by reference as if fully set forth herein.

23.  On or about May 19, 2009, in the Middle District of

Pennsylvania and elsewhere,

ROBERT G. BARD

-15-

knowingly and willfully made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of a department or agency of the United States, by stating to a Special Agent of the Federal Bureau of Investigation, who was conducting an official investigation of Bard's activities, that (1) he had never seen Morningstar account statements in the name of M.S. and N.S.; (2) that he never provided Morningstar account statements to M.S. and N.S.; (3) that he was unaware of transfers of funds out of M.S.'s IRA account until he saw the 1099R form which was sent to M.S. from T.D. Ameritrade; (4) that the federal tax return for M.S. and N.S. which he prepared and showed that the IRA withdrawal for M.S. was rolled-over into another IRA was a mistake and not done intentionally; (5) that T.D. Ameritrade did not provide him with a reason for terminating its relationship with him.

24.   The aforesaid statements made by Bard were false, fictitious, and fraudulent, as Bard well knew, in that (1) he had created the Morningstar account statements in the name of M.S. and N.S.; (2) he provided the Morningstar account statements to M.S. and N.S.; (3) he directed a Vision Specialist employee to sign IRA withdrawal documents for M.S.'s IRA account prior to

-16-

seeing the 1099R form documenting the withdrawal; (4) that he intentionally falsified the M.S. and N.S. tax return by showing that the IRA funds were rolled-over rather than withdrawn; and (5) T.D. Ameritrade informed him the reasons for terminating its relationship with him.

In violation of Title 18, United States Code, Section 1001.

A TRUE BILL

_____
FOREPERSON, GRAND JURY

_____
PETER J. SMITH
U.S. ATTORNEY

_____
DATE