IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA**      :
                                  :      **Crim. No. 1:12-CR-0181**
                                  :
**v.**                            :
                                  :
                                  :      **Judge Sylvia H. Rambo**
**ROBERT G. BARD**                :

## O P I N I O N

　　As a result of his executing a fraudulent scheme involving the investment of securities on behalf of numerous individuals, Defendant Robert G. Bard was convicted by a jury in the United States District Court for the Middle District of Pennsylvania of 21 counts, including one count of securities fraud, in violation of 15 U.S.C. § 78j(b), fourteen counts of wire fraud, in violation of 18 U.S.C. § 1343, three counts of mail fraud, in violation of 18 U.S.C. § 1341, one count of bank fraud, in violation of 18 U.S.C. § 1344, one count of investment advisor fraud, in violation of 15 U.S.C. § 80b-6, and one count for making false statements to a special agent of the FBI during the course of the agent's investigation, in violation of 18 U.S.C. § 1001.  Presently before the court are Defendant's objections to the Presentence Investigation Report, in which he disputes, *inter alia*, the number of victims involved and the proper amount of loss pursuant to Section 2B1.1 of the Sentencing Guidelines.  For the following reasons, the court concludes that the loss attributable to Defendant's conduct is between $2.5 million and $7 million, which represents the amount of funds lost as a result of Defendant's actions.  The court further concludes that this case involves fifty or more victims.  Accordingly, the court will overrule Defendant's objections in this regard and impose an eighteen-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(J) and a four-level increase pursuant to U.S.S.G. § 2B1.1(b)(2)(B).

## I.        Background

Defendant was president and sole owner of Vision Specialist Group ("Vision Specialist"), an investment advisory firm registered in Pennsylvania and located in Defendant's hometown, Warfordsburg, Pennsylvania.  In that capacity, Defendant perpetrated a fraudulent scheme wherein he solicited and obtained millions of dollars of his clients' funds under false pretenses.  To do so, Defendant preyed on members of his community, many of whom were elderly and unsophisticated individuals with no experience in financial matters, representing himself to be a deeply religious man of the highest integrity and failing to disclose that in September 2004, he was terminated as a stock broker by the Financial Industry Regulatory Authority ("FINRA") after the brokerage firm he worked for, Centraurus, discovered that he had prepared and submitted investment documents that contained forged customer signatures.  As a result of the foregoing, in October 2005, Defendant signed a letter of acceptance, waiver, and consent, which barred his association with any FINRA member.  Furthermore, Defendant failed to inform his clients that he was in bankruptcy from July 22, 2005 through August 11, 2011, at which time his personal debts were discharged.  Defendant represented to his clients that he had eighteen years of financial success and that he could be trusted with their life savings.

Unfortunately, Defendant could not be so trusted.  Defendant provided his clients with fee-based advisory services, and Vision Specialist calculated the fee amounts and requested payments from the custodial broker, TD Ameritrade.  The fees were deducted directly out of the clients' accounts and transferred into Defendant's operating account.  While Defendant had the authority to use his

2

discretion to make investments on his clients' behalf without their prior consultation, the investments were required to be made consistent with his clients' risk tolerances and objectives.  Defendant invested in highly speculative and risky securities, using margin loans to fund purchases, which had the effect of increasing his clients' risks and ultimately resulted in margin calls when the values of the securities declined. Beginning in September 2006, Defendant invested millions of dollars of his clients' money in L International Computers Inc. ("L-International"), a penny stock pink sheet issuer whose trading was temporarily suspended by the SEC due to concerns over the accuracy and adequacy of publicly disseminated information, and continued to do so even after he himself complained that L-International was a "bogus" company with no real product.  Defendant similarly invested in numerous other securities, notwithstanding the continued poor performance of the investments.

Defendant used a variety of methods to mislead his clients into believing their account balances were much greater than they were and were actually increasing in value despite the downturn in the economy.  For example, to conceal the losses, Defendant repeatedly provided clients with false verbal assurances and manufactured fraudulent account statements that grossly overstated the values in their accounts.  He untruthfully told his clients that there were procedures in place that would guard against any significant losses to their accounts.  Although his clients received account statements directly from the custodial broker that accurately reported the values, Defendant caused his clients to disregard the accurate statements by using the manufactured documents coupled with his explanations that the custodial broker's statements did not include the entirety of the client's investments.

Following these continued misrepresentations, Defendant's clients continued to invest with him.

Following an internal investigation that revealed unscrupulous activities, TD Ameritrade terminated its relationship with Defendant. Defendant misrepresented to his clients the basis of TD Ameritrade's terminating the investment relationship, characterizing himself as a victim of the down-turned economy. Defendant encouraged his clients to continue investing with him and move their accounts to new broker-dealers. Either Defendant, or Vision Specialists' sole employee, Ned Donaldson, forged clients' signatures on these documents and overstated the clients' risk tolerance.

Unbeknownst to the clients, Defendant caused them to lose, in some cases, the entire corpus of their savings, while collecting $852,383.00 in fees for his services. Following trial, during which many but not all of the defrauded investors testified, a jury convicted Defendant of the numerous charges related to his participation in the foregoing fraud.

## II.       Discussion

In the Presentence Investigation Report, the probation officer calculated the amount of loss attributable to the overall conspiracy to defraud and commit mail and wire fraud to be between $2.6 and $5.8 million, which, pursuant to U.S.S.G. § 2B1.1(b)(1)(J), resulted in an 18-level increase to the Offense Level Computation. Further, in the initial Presentence Investigation Report, the probation officer calculated that the scheme involved more than 250 victims, which, pursuant to U.S.S.G. § 2B1.1(b)(2)(C), resulted in a 6-level increase to the Offense Level Computation. The probation officer has indicated her intention to reduce the number

of victims involved to 66, which will result in a four-level increase pursuant to U.S.S.G. § 2B1.1(b)(2)(B).  Defendant objects to the probation officer's calculations for loss and number of victims.

Specifically, Defendant argues that the loss in this matter is zero due to stock market conditions at the time of the fraud.  Regarding the number of victims, Defendant argues that the Government failed to present evidence that his conduct victimized more than 250 individuals.[1]

Section 2B1.1 of the Sentencing Guidelines provides the base offense level for defendants convicted of crimes involving fraud and deceit, and various increases in the offense level depending on the amount of money at issue.  In determining the loss attributable to the relevant conduct, the Government bears the burden of proving loss with reliable and specific evidence.  The court is to apply the greater of the actual or intended loss.  U.S.S.G. § 2B1.1 cmt. n.3(A).  Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," *id.* at cmt. n. 3(A)(i), while intended loss is defined as the "pecuniary harm that was intended to result from the offense . . . and includes intended pecuniary harm that would have been impossible or unlikely to occur," *id.* at cmt. n.3(A)(ii). Pecuniary harm "means harm that is monetary or that otherwise is readily measurable in money." *Id.* at cmt. n.3(A)(iii).  "Reasonably foreseeable pecuniary harm" means harm "that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* at cmt. n.3(A)(iv).  If a loss cannot be reasonably determined, the Guidelines instruct the courts to "use the

---

[1]  The court anticipates that Defendant would assert the same defense to the revised victim calculation as he did to the initial calculation.

gain that resulted from the offense as an alternative measure of loss." *Id*. at cmt. n.3(B). The Guidelines further provide that the court "need only make a reasonable estimate of the loss." *Id*. at cmt. n.3(C).

The Guidelines require that a defendant's offense level be enhanced if his offense involved at least ten victims. *See* U.S.S.G. § 2B1.1(b)(2). "If the offense . . . involved 50 or more victims," the offense level is to be "increase[d] by 4 levels." U.S.S.G. § 2B1.1(b)(2)(B). "Victim," as used in Section 2B1.1(B)(2), is defined to mean "any person [including individuals, corporations, and companies] who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1 cmt. n. 1. In making a sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence, so long as it has "sufficient indicia of reliability." U.S.S.G. § 6A1.3; *see also United States v. Green*, 516 F. App'x 113, 132 (3d Cir. 2013).

### A.  <u>Amount of Loss</u>

The court concludes that an eighteen-level enhancement to Defendant's sentencing guideline for the amount of loss is warranted and that Defendant's objection in this regard is without merit. The extensive evidence presented at trial demonstrated that Defendant's verbal misrepresentations caused his clients to invest with him and continue doing so. Defendant created fake account statements to substantiate his assurances that his clients' investments were increasing in value. This, of course, was in stark contrast to the reality of the value of their investments. The court has little trouble concluding that Defendant's conduct caused the funds invested with him to be lost. In reaching its conclusion that the amount of loss in this case falls between $2.5 million and $7 million, the court relies on both the

executive summary of the 100 largest accounts managed by Vision Specialist, which calculated a total loss of $5.8 million (Gov. Ex. 5, *admitted at* Hr'g, Mar. 11, 2014), and the executive summary of the select accounts that represent the time period where there is evidence that Defendant provided victims with falsified statements, which calculated a total loss of $2.6 million (Gov. Ex. 8, *admitted at* Hr'g, Mar. 11, 2014). Using either of these alternative methods to calculate loss results in the same guideline enhancement. *See* U.S.S.G. § 2B1.1(b)(1)(J).

Defendant argues that he never intended to cause his clients to lose money through his actions and that the fraudulent activities occurred to mask his embarrassment and shame rather than to ensure his clients continued to invest. This argument is unavailing. Here, Defendant lured his clients to invest with him by falsely representing his qualifications and investment success and continued to bait them with his assurances and fraudulent account statements. As a direct result of his actions, the investors suffered an actual loss over $2,500,000.00, the amount their accounts decreased in value through investing with Defendant. This amount also represents the intended loss, as it is the amount of money he placed at risk. The fact that Defendant may not have wanted to cause a loss is irrelevant; in fact, he may have hoped just the opposite. Nevertheless, the loss was an intended consequence of Defendant's fraud no matter how golden his intentions.

Defendant's argument that the stock market conditions are to blame for his clients' losses is equally unavailing. Future events that are beyond the defendant's control cannot affect his intent. Indeed, this is a concept embodied in reasonably foreseeable pecuniary harm being measured by the amount of harm that the defendant knew or, under the circumstances, reasonably should have known, was

a potential result of the offense.  *See* U.S.S.G. § 2B1.1 cmt. n.3(A)(iv).  The evidence of record establishes that the defrauded investors were confident in Defendant's financial advisement abilities because he showed them account statements, albeit fraudulent statements, demonstrating that their investments were thriving in a generally down-turned economy.  Indeed, Defendant was well aware of the market conditions prevailing during the relevant time.  It was certainly reasonably foreseeable that these investors would lose their money through Defendant's unauthorized risky investments.  Moreover, to the extent the stock market conditions had any impact on the amount of loss, the court believes that Defendant, rather than the investors, should bear the risk of forces beyond his control.  Each of his clients came to Defendant and asked him to place their money in a relatively risk-free investment.  Defendant knowingly did just the opposite.  To the extent that the market conditions are implicated in calculating the amount of loss, they have done so due to Defendant's own conduct.

In conclusion, the amount of the loss, for purposes of sentencing, is the amount that Defendant placed at risk through his fraudulent conduct.  That amount measures the gravity of his crime; that he may have hoped or even expected a miracle that would deliver his intended victims from harm is both impossible to verify and peripheral to the danger that his fraudulent conduct posed to the community.  Accordingly, Defendant's objection to the eighteen-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(J) will be overruled.

**B.     Number of Victims**

Furthermore, the court concludes that a four-level enhancement to Defendant's sentencing guideline for the number of victims is warranted and that

Defendant's objection in this regard is without merit.  The extensive evidence presented at trial and to the probation officer established that Defendant's misrepresentations caused individuals to continually invest their money with Defendant.  Indeed, Defendant admitted that he gave fraudulent account statements to thirty of his clients.  (Gov. Ex. 3, *admitted at* Hr'g, Mar. 11, 2014, pp. 1-2.)  In addition to the foregoing thirty individuals, eight individuals received fraudulent account statements from Defendant and lost at least a portion of their investments.  (*Id.* at p. 3.)  Moreover, there were 28 individuals who stated that they lost money and received false statements on the nature and profitability of their accounts and would not have invested with Defendant but for his misrepresentations.  (*Id*. at pp. 4-5.)

The court has little trouble determining that these 66 individuals were victims under the sentencing guidelines because each of these victims lost part of the actual loss calculated in this case.  *See* U.S.S.G. § 2B1.1 cmt. n.1; *see also supra* Part III.A.  There was certainly a causal connection between Defendant's misrepresentations and his clients' continued investments.  The investors would not have invested had they known about Defendant's bankruptcy petition, reason for termination from Centraurus, and his NASD bar.  Moreover, the investors would have terminated their investing with Defendant had they known the true value of their investments.  Defendant's conduct concealed the truth and operated to cause the defrauded individuals to invest their money.  Accordingly, the court concludes that a four-level enhancement pursuant to U.S.S.G. § 2B.1.1(b)(2)(B) is warranted.

### III.        Conclusion

Based on the foregoing, the court concludes that the amount of loss in this case equals the entire amount of the decrease in value of the client's investment accounts sustained by more than fifty victims and rejects Defendant's contention that the stock market conditions caused his clients' losses.  Accordingly, the court will overrule Defendant's objections to the amount of loss and number of victims, and the court will impose an eighteen-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(J) and a four-level increase pursuant to U.S.S.G. § 2B1.1(b)(2)(B).

s/Sylvia H. Rambo
United States District Judge

Dated:  July 3, 2014.